**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**ALLENTOWN DIVISION**

| | |
|---|---|
| JUNKO TSUCHIDA,<br><br>Plaintiff,<br><br>vs.<br><br>EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION LLC;<br><br>Defendants. | Case No.: 5:26-cv-7703<br><br>**COMPLAINT WITH JURY DEMAND** |

Plaintiff, by and through the undersigned counsel, alleges, based upon Plaintiff's personal knowledge, information and belief, and the investigation of counsel, as follows:

**INTRODUCTION**

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, consumer reporting agencies ("CRAs")

acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information.

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system: "The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." *See* 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make

> him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10. Plaintiff's claims arise out of Defendants' blatantly inaccurate credit reporting, wherein Defendants reported to Plaintiff's potential creditors that Plaintiff had an outstanding Verizon Wireless collection account, and/or that the Verizon Account had previously been placed in collection, despite Plaintiff having returned the Verizon equipment and Verizon having previously reflected a $0 balance on the account.

11. Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and for failing to conduct a reasonable

reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

12. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

13. Plaintiff Junko Tsuchida ("Plaintiff") resides in Upper Saucon Township, Pennsylvania and qualifies as a "consumer" under the FCRA.

14. Defendant Equifax Information Services, LLC ("Equifax") is a consumer reporting agency that maintains its principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.

15. Defendant Experian Information Solutions, Inc. ("Experian") is a consumer reporting agency that maintains its principal place of business at 475 Anton Boulevard, Costa Mesa, California 92626.

16. Defendant Trans Union LLC ("Trans Union") is a consumer reporting agency that maintains its principal place of business at 555 West Adams Street, Chicago, Illinois 60661.

17. Defendants Equifax, Experian, and Trans Union are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

18. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

19. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Plaintiff Obtains Verizon Service and Subsequently Cancels the Service

20. On or about August 26, 2024, Plaintiff entered into an agreement with Verizon Wireless ("Verizon") for internet service.

21. After the service was established, Plaintiff experienced continuing difficulty obtaining a reliable internet connection.

22. In or around November 2024, after the internet-service problems persisted, Plaintiff contacted Verizon and requested cancellation of the service.

23. Verizon advised Plaintiff to pay the remaining balance appearing on the Verizon Account (account number beginning in 342730) (the "Verizon Account") and informed her that Verizon would provide a return label so that she could return Verizon's equipment.

24. On November 25, 2024, Plaintiff paid the $72.06 balance reflected on the preceding Verizon statement.

25. The November 25, 2024 statement thereafter reflected a $0 balance forward and a $3.52 credit for monthly service charges, together with other charges and credits, leaving a total amount due of $1.68.

26. On December 11, 2024, Verizon provided a return label for the return of the Verizon equipment.

27. Plaintiff promptly returned the equipment through UPS using the return label provided by Verizon. The equipment was delivered to Verizon on December 17, 2024, just six days after Verizon provided the return label by email.

28. Plaintiff's December 25, 2024 Verizon Account statement continued to reflect the same remaining $1.68 balance and did not reflect new monthly internet-service charges.

29. On January 2, 2025, Plaintiff paid the remaining $1.68 reflected on the Verizon Account.

30. Verizon's January 25, 2025 statement thereafter reflected a $0 balance on the Verizon Account.

31. By that time, Plaintiff had requested cancellation of the Verizon internet service, paid the amounts then reflected as due on the account, and returned Verizon's equipment using the return label that Verizon provided.

32. In light of those events and Verizon's January 25, 2025 statement reflecting a $0 balance, Plaintiff reasonably understood that no further balance remained due on the Verizon Account.

**Verizon Resumes Billing After the Account Reflected a Zero Balance**

33. Despite the January 25, 2025 statement reflecting a $0 balance, Plaintiff's subsequent February 2025 Verizon Account statement reflected a new balance of $79.03.

34. The February 2025 balance included new charges associated with the Verizon internet service.

35. The following March 2025 Verizon Account statement reflected that the account balance had increased to $156.39.

36. The April 2025 Verizon Account statement reflected a prior balance of $156.39 and adjustments resulting in a reduced balance of $115.25.

37. The May 2025 Verizon Account statement thereafter reflected a balance of $120.55.

38. The June 2025 Verizon Account statement reflected a balance forward of $120.55 and an additional equipment charge of $299.97, resulting in an amount due of $420.52.

39. By the time Verizon assessed the $299.97 equipment charge, UPS records reflected that the Verizon equipment had already been delivered to Verizon's return facility approximately six months earlier, on December 17, 2024.

**Plaintiff Disputes Verizon's $420.52 Charge with American Express**

40. On or about July 22, 2025, Verizon charged $420.52 to Plaintiff's American Express credit card.

41. After seeing the charge, Plaintiff contacted Verizon to inquire about the amount.

42. During that communication, Verizon advised Plaintiff that the charge concerned equipment associated with the Verizon Account and asserted that the equipment had not been returned.

43. Plaintiff advised Verizon that she had already returned the equipment using Verizon's return label.

44. After Verizon failed to resolve the matter, Plaintiff disputed the $420.52 transaction with American Express and submitted documentation concerning the return of the equipment.

45. On August 8, 2025, American Express informed Plaintiff that, as a result of its investigation, it was crediting $420.52 to her account.

46. After the American Express credit, Plaintiff's August 2025 Verizon Account statement again reflected an outstanding balance of $420.52.

47. By September 2025, Plaintiff's Verizon Account statement reflected a balance of $426.29.

**Experian and Trans Union Report the Verizon Account as a Collection Account**

48. In or around March 2026, Plaintiff noticed a substantial decline in her credit score and subsequently reviewed her Experian and Trans Union consumer reports.

49. Upon review, Plaintiff discovered that the Verizon Account was being reported as a collection account by Experian and Trans Union, with a past-due balance of $426.

50. At this point, Plaintiff had already returned Verizon's equipment, paid the amounts then reflected as due, and received a Verizon statement showing a $0 balance.

51. As such, Plaintiff believed that the account was closed and satisfied, and that there would not be any further issues associated with this account.

**Plaintiff Disputed with Defendants Experian and Trans Union**

52. After discovering the Verizon collection account on her Experian and Trans Union consumer reports, Plaintiff disputed the accuracy of the account directly with Experian and Trans Union through their online dispute portals.

53. In those disputes, Plaintiff challenged the Verizon collection status because she had previously returned Verizon's equipment, paid the amounts then reflected as due on the account, and received a Verizon statement showing a $0 balance.

54. Plaintiff provided information sufficient to place Experian and Trans Union on notice that she was disputing not only the amount of the reported balance, but whether the Verizon Account properly constituted a collection obligation at all.

**Defendant Experian's Unreasonable Dispute Reinvestigation**

55. Upon information and belief, Experian sent Verizon an automated consumer dispute verification ("ACDV") pursuant to Plaintiff's dispute submitted to Experian in or around May 2026.

56. On or about May 8, 2026, Experian completed its reinvestigation of Plaintiff's online dispute and reported that the Verizon Account had been "Updated."

57. Following its reinvestigation, Experian continued reporting the Verizon Account as a collection account with a past-due balance of $426.

58. On or about May 29, 2026, Experian completed another reinvestigation and advised Plaintiff that the information she disputed concerning the Verizon Account had been "verified as accurate," although information unrelated to her dispute had been updated.

59. Following its reinvestigation, Experian continued reporting the Verizon Account as a collection account with a past-due balance of $426.

60. Upon information and belief, Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

61. Upon information and belief, Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute submitted in or around May 2026.

62. Thereafter, Experian failed to correct or delete the disputed Verizon collection account from Plaintiff's credit file and continued reporting the account as a collection account with a $426 past-due balance.

63. Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in or around May 2026, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

64. Upon information and belief, Trans Union sent Verizon an automated consumer dispute verification ("ACDV") pursuant to Plaintiff's dispute submitted to Trans Union in or around May 2026.

65. On or about May 1, 2026, Trans Union completed its reinvestigation of Plaintiff's online dispute concerning the disputed Verizon Account and advised Plaintiff that it had updated information associated with the account.

66. Trans Union stated that its investigation resulted in changes to the balance, date updated, past-due amount, pay status, remarks, and rating associated with the Verizon Account.

67. Following that investigation, Trans Union corrected the reported balance but nevertheless continued reporting the Verizon Account with the pay status: "Account Paid in Full; was a Collection."

68. On or about June 2, 2026, Trans Union completed another investigation and stated that the disputed Verizon information had been updated.

69. Following Trans Union's June 2026 reinvestigation, Trans Union updated the Verizon Account pay status to "In Collection."

70. Trans Union further reported the following remarks: "SETTLED-LESS THAN FULL BLNC" and "PAID COLLECTION."

71. Upon information and belief, Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

72. Upon information and belief, Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute submitted in or around May 2026.

73. Thereafter, Trans Union failed to correct or delete the disputed Verizon collection reporting from Plaintiff's credit file and continued to report the account with a derogatory collection-related status.

74. Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in or around May 2026, or any reinvestigation whatsoever, to determine whether the

disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff Submitted CFPB Disputes**

75. In May 2026, Plaintiff submitted complaints through the Consumer Financial Protection Bureau ("CFPB") website concerning the disputed Verizon Account appearing on her consumer reports.

76. On May 16, 2026, Plaintiff submitted a CFPB complaint against Experian concerning its continued, inaccurate reporting of the Verizon account.

77. On May 17, 2026, Plaintiff submitted a separate CFPB complaint against Trans Union concerning its continued, inaccurate reporting of the same Verizon Account.

78. In those complaints, Plaintiff explained that she had returned Verizon's equipment using the return label Verizon provided and that UPS records confirmed delivery of the equipment to Verizon.

79. On June 21, 2026, Trans Union responded to Plaintiff's CFPB complaint and advised that it had conducted an investigation and mailed the results to Plaintiff.

80. Trans Union nevertheless continued reporting the disputed Verizon Account as a derogatory collection account.

81. On July 15, 2026, Experian responded to Plaintiff's CFPB complaint and stated that it had reviewed the supporting documents Plaintiff submitted through the CFPB and directly to Experian and had conducted a reinvestigation of the disputed Verizon Account.

82. Experian further stated that it contacted the furnisher of the disputed information and that the furnisher verified the disputed information as accurate.

83. Experian thereafter continued reporting the Verizon Account as a collection account despite Plaintiff's repeated disputes and Experian's receipt of supporting documentation concerning the return of Verizon's equipment.

**Plaintiff Submitted Additional Disputes in July 2026**

84. As of July 16, 2026, Defendant Equifax was reporting Plaintiff's Verizon Account as a collection account with a balance of $503, and a date of first delinquency of August 9, 2025.

85. As of July 17, 2026, Defendant Experian was reporting Plaintiff's Verizon Account as a collection account, with a balance of $503, an original balance of $426, and $503 past due, while reporting collection activity for April through June 2026.

86. As of July 16, 2026, Defendant Trans Union was reporting Plaintiff's Verizon Account with the adverse pay status "Collection" and the remarks "SETTLED-LESS THAN FULL BLNC" and "PAID COLLECTION."

87. On or about July 23, 2026, Plaintiff submitted written disputes by United States Postal Service Certified Mail to Defendants Equifax, Experian, and Trans Union.

88. In her disputes, Plaintiff challenged the reporting of the Verizon Account as a collection obligation and explained that she had returned Verizon's equipment and paid the amounts then reflected as due on the account.

89. Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

90. Upon information and belief, Equifax sent Verizon an automated consumer dispute verification ("ACDV") pursuant to Plaintiff's July 2026 dispute to Equifax.

91. On or about August 14, 2026, Equifax completed its reinvestigation and stated that Plaintiff had disputed the accuracy of the Verizon Account information and that the disputed information "should be updated."

92. Following the reinvestigation, Equifax continued reporting a $503 balance, retained the August 9, 2025 Date of First Delinquency, and continued identifying the Verizon Account as a collection account.

93. Equifax also removed the notation "Consumer Disputes This Account Information" and added the notation "Account Previously in Dispute – Now Resolved by Data Furnisher."

94. Upon information and belief, Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

95. Upon information and belief, Equifax failed to conduct a reasonable reinvestigation of Plaintiff's July 2026 dispute.

96. Thereafter, Equifax failed to correct or delete the disputed Verizon collection reporting and continued to report the Verizon Account as a collection with a balance of $503.

97. Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in July 2026, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Dispute Reinvestigation**

98. Upon information and belief, Experian sent Verizon an automated consumer dispute verification ("ACDV") pursuant to Plaintiff's July 2026 dispute to Experian.

99. On or about August 10, 2026, Experian completed its reinvestigation of Plaintiff's July 2026 written dispute and advised that the disputed Verizon information had been verified as accurate and updated.

100. Experian further added the comment "Completed investigation of FCRA dispute – consumer disagrees" and the reinvestigation notation "This item was updated from our processing of your dispute in Aug 2026."

101. Upon information and belief, Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

102. Upon information and belief, Experian failed to conduct a reasonable reinvestigation of Plaintiff's July 2026 dispute.

103. Thereafter, Experian failed to correct or delete the disputed Verizon collection reporting and continued to report the Verizon Account as a collection account with a balance of $503.

104. Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in July 2026, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

105. Upon information and belief, Trans Union received Plaintiff's July 2026 dispute.

106. As Plaintiff received no response from Trans Union concerning her July 2026 written dispute, she contacted Trans Union on August 27, 2026 to inquire about its status and provided the tracking information confirming delivery of her written dispute.

107. Trans Union's representative advised Plaintiff that Plaintiff had not filed a dispute.

108. The representative further told Plaintiff that a dispute could only be filed online and that she could not submit the dispute by mail. The representative directed Plaintiff to Trans Union's online dispute portal.

109. Despite Plaintiff submitting at least two disputes to Trans Union, Trans Union continued reporting the Verizon Account as derogatory and in "Collection / Charge-Off" status on Plaintiff's September 3, 2026 consumer report.

110. Upon information and belief, Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

111. Upon information and belief, Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's July 2026 dispute.

112. Thereafter, Trans Union failed to correct or delete the disputed Verizon collection reporting and continued to report the account as derogatory and in "Collection / Charge-Off" status.

113. Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in July 2026, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendants' Method for Considering Consumer Credit Report Disputes**

114. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

115. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

116. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

117. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

118. Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

119. Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

120. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

121. These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

122. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

123. The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

124. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging

to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Plaintiff's Damages**

125. Plaintiff reasonably believes that Defendants continued to publish information concerning the Verizon Account reflecting that Plaintiff's account was in collection, including collection balances and derogatory collection-related status information.

126. As a result of the inaccurate Verizon Account, and despite Plaintiff's prior cancellation request, payment of the amounts then due, and return of the Verizon equipment, Defendants made it practically impossible for Plaintiff to continue to obtain credit.

127. On or about July 19, 2026, Plaintiff applied for a Synchrony Mastercard. Synchrony Bank denied Plaintiff's request and thereafter issued an adverse action notice dated July 23, 2026, identifying Trans Union as one of two consumer reporting agencies from which information was obtained in connection with the credit denial. Plaintiff's Trans Union credit report was accessed in connection with that application while the disputed Verizon Account information remained on her Trans Union credit file.

128. On or about August 28, 2026, Plaintiff applied for a PenFed Credit Card and was denied. Plaintiff's Equifax credit report was accessed in connection with that application while the disputed Verizon Account information remained on her Equifax credit file. In its denial letter, PenFed cited Plaintiff's delinquent past or present credit obligations.

129. During this same period, Plaintiff experienced a substantial decline in her credit score. Experian reported Plaintiff's FICO Score as 832 on July 17, 2026, but notified Plaintiff on August 12, 2026, that her score had decreased by 150 points to 672, reducing her credit rating from "Exceptional."

130. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendants.

131. At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff.

132. As a standard practice, Equifax, Experian, and Trans Union do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

133. Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' FCRA violations are willful.

134. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of credit opportunities; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

**COUNT I**
**15 U.S.C. § 1681e(b)**

135. Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

136. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports. *See* 15 U.S.C. § 1681e(b).

137. In 2026, Defendants Equifax, Experian, and Trans Union prepared inaccurate consumer reports concerning Plaintiff.

138. Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintained concerning Plaintiff.

139. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of credit opportunities; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

140. Defendants' conduct, actions, and inactions were willful, or at least negligent, rendering them liable for actual damages, statutory damages, punitive damages and attorneys' fees and costs in an amount to be determined by the Court under 15 U.S.C. §§ 1681n and 1681o.

**COUNT II**
**15 U.S.C. § 1681i**

141. Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

142. The FCRA mandates that a consumer reporting agency conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information

contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

143. The FCRA provides that if a consumer reporting agency conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the consumer reporting agency is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

144. On at least one occasion during 2026, Plaintiff disputed the inaccurate reporting of her Verizon Account information with Equifax and requested that Equifax correct and/or delete the inaccurate balance and collection status.

145. On at least two occasions during 2026, Plaintiff disputed the inaccurate reporting of her Verizon Account information with Experian and requested that Experian correct and/or delete the inaccurate balance and collection status.

146. On at least two occasions during 2026, Plaintiff disputed the inaccurate reporting of her Verizon Account information with Trans Union and requested that Trans Union correct and/or delete the inaccurate balance and collection status.

147. In response to Plaintiff's disputes, Equifax, Experian, and Trans Union failed to conduct reinvestigations, or such investigations were so shoddy as to allow inaccurate and damaging information to remain in Plaintiff's credit files.

148. Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i by failing to conduct reasonable reinvestigation(s) to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the

notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

149. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of credit opportunities; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

150. Defendants' conduct, actions, and inactions were willful, or at least negligent, rendering them liable for actual damages, statutory damages, punitive damages and attorneys' fees and costs in an amount to be determined by the Court under 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs, and awarding Plaintiff such other and further relief as the Court may deem appropriate and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2026,

*/s/ Robert M. Tobia*

Robert M. Tobia, Sr., Esquire, PA Bar#54513
GLANZBERG TOBIA LAW, P.C.
123 South Broad Street, Suite 1640
Philadelphia, PA 19109
Tel: (215) 981-5400
Email: robert.tobia@gtlawpc.com

*Attorneys for Plaintiff*
*Junko Tsuchida*